**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

H. THOMAS MORAN II, Receiver of    :
the Assets of LifeTime Capital, Inc. and
Certain Affiliated Persons and Entities,    :

      Plaintiff,             :     Case No. 3:05CV071

   vs.                    :     District Judge Thomas M. Rose
                          Magistrate Judge Sharon L. Ovington

A/C FINANCIAL, INC., et al.,      :

      Defendants.         :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    BACKGROUND

In 2004, before the present case began, H. Thayne Davis filed a case in this Court against

LifeTime Capital, Inc. *Davis v. LifeTime Capital, Inc.*, Case No. 3:04cv0059 (S.D. Ohio). Davis

and more than 3,000 other individuals had lost millions through investments in viatical life

insurance contracts with LifeTime. This occurred as follows.

LifeTime obtained, at a discount, life insurance policies from terminally-ill people known

as viators. LifeTime essentially sold ownership interests in these life insurance polices to

investors. In exchange for an investment, LifeTime promised to match an investor to a life

insurance policy of a viator whose life expectancy corresponded to the investor's desired term of

investment. LifeTime then assigned to the investor a beneficial interest in the life insurance

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

policy equaling the amount of the investor's investment plus a promised return.  Upon the

viator's death and the resulting maturity of his or her life insurance policy, the investor would

receive the value of the promised beneficial interest.

The benefits purportedly flowing from the Lender and Escrow Agreements were several:

the viator would receive money to use in advance of his or her death; upon maturity of the life

insurance policy, *i.e.*, when the viator dies, the investor would receive a higher rate of return than

other investments tend to yield (assuming the viator dies within the life expectancy quoted to the

investor); and LifeTime would retain the funds remaining from matured policies, minus

administrative and certain other costs.

"The marketing of viaticals is legal, but their purchase carries financial risk to the

investor."  *United States v. Jamieson*, 427 F.3d 394, 400 (6th Cir. 2005).  Indeed, "the return in a

viatical investment is extremely unpredictable and risky."  *In re Financial Federated Title and

Trust, Inc.*, 347 F.3d 880, 882 (11th Cir. 2003).  That the viatical industry is likewise vulnerable

to criminal misdeeds was amply demonstrated by LifeTime's creator, David W. Svete, and

others, who have been convicted of several federal crimes related to LifeTime in the United

States District Court for the Northern District of Florida, Pensacola Division, Case No.

3:04cr10/MCR.  The massive scope of the fraud perpetrated by Svete and others is perhaps best

understood by the $100,722,605.34  restitution order in the underlying criminal case.

This case is presently before the Court upon a Motion to Compel Arbitration filed by the

"Heartland Defendants" – Heartland Viatical, Inc., Erika Blackburn, Thomas Parker, Kenneth

W. Johnson, Brent Worley, and Robert Boone (Doc. #154), various Defendants' Notice to Join

Heartland's Motion to Compel Arbitration (Doc. #203), the Receiver's Memorandum in

Opposition (Doc. #239), and the Heartland Defendants' Reply (Doc. #248). Also before the Court are Defendant Lewis McBride's Motion to Compel Arbitration (Doc. #237), the Receiver's Memorandum in Opposition (Doc. #286), and Defendant McBride's Reply (Doc. #312).

The Defendants who have joined the Heartland Defendants' Motion to Compel Arbitration, along with Defendant McBride, seek to raise the identical arguments raised by the Heartland Defendants' Motion to Compel Arbitration. Consequently, further references to the Heartland Defendants includes these other Defendants, except where otherwise noted.

## II.     THE RECEIVERSHIP
##         AND THE RECEIVER'S COMPLAINT

In *Davis v. LifeTime* this Court took exclusive jurisdiction and possession of LifeTime's assets, created a Receivership, and appointed H. Thomas Moran, II as the Receiver of LifeTime's assets. The need to create the LifeTime Receivership was "both necessary and appropriate in order to prevent waste and dissipation of the assets of Defendant [LifeTime] to the detriment of the investors...." (*Moran v. A/C Financial, et al*., Case No. 3:05cv0071, Doc. #239, Exh. 1, Order at 1).[2] The Court authorized and empowered the Receiver "to take any and all action as the Receiver may deem necessary or prudent for the preservation, maintenance, and administration of the LifeTime Portfolio comprised of viatical and life settlement policies and beneficial interests therein...." *Id*., Order at 3. In addition, the Order appointing the Receiver stated in part:

_____

[2] All remaining citations to docket numbers refer to documents filed in the present case, *Moran v. A/C Financial*, Case No. 3-05cv0071.

3

   12. The Receiver is hereby authorized to institute, defend, compromise or adjust such actions or proceedings in state or federal courts now pending and hereafter instituted as may, in his discretion, be advisable or proper for the protection of the Receivership Assets or proceeds therefrom, and to institute, prosecute, compromise or adjust such actions or proceedings in state or federal court as may, in his judgment, be necessary or proper for the collection, preservation, and maintenance of the Receivership Assets.

*Id.*, Order at 5.  Pursuant to this authority, the Receiver filed the present case raising claims under federal and Ohio securities laws, federal and state racketeering laws, and various claims under state law.

   The Receiver alleges in part that Defendants, "as LifeTime sales agents or brokers, were the liaison between LifeTime and its source of money, the investors.  Without the Defendants, the Ponzi scheme which LifeTime effectively became could not be sustained."[3]  (Doc. #1 at ¶32).

   The Receiver's factual allegations against Defendants largely focus on their activities in convincing people to invest in LifeTime's viaticals.  The Receiver alleges that many Defendants had close relationships with LifeTime, David Svete, and other LifeTime insiders, and through these relationships, Defendants knew or should have known about LifeTime's fraudulent activities.  According to the Receiver, Defendants failed to conduct any meaningful due diligence concerning LifeTime's activities or its viaticals to confirm the accuracy of their representations to investors.

   One of the more dramatic misrepresentations described by the Receiver was Defendants'

---

  [3]  A Ponzi scheme is a swindle wherein some early investors succeed in obtaining large returns on investments.  Rather than the product of legitimate income-generating activities, the payoffs to these investors is made from funds provided by later investors.  The fact that some early investors obtained a large return on their investments is then used to encourage additional investors, who are often duped into investing ever-greater sums without realizing the ever-shrinking chance of obtaining any positive return on their investment.  Things get even worse for investors when the Ponzi schemer begins to siphon money from the solicited funds for his or her ill-gotten gain.  Ill-gotten because this inevitably strips the Ponzi scheme of its assets, the swindle collapses, and nearly all investors lose.  *See, e.g, Knauer v. Jonathon Roberts Financial Group, Inc.*, 348 F.3d 230, 233 (7th Cir. 2003); *Cunningham v. Brown,* 265 U.S. 1, 13 (1924).

statements to investors that they were investing in life insurance policies that insured people with life expectancies of between twelve and sixty months – as determined by an independent life expectancy analysis.  Rather than being independent or based on legitimate criteria, the life expectancy analysis had been provided by Medical Underwriting, Inc. (MUI), an entity not independent of LifeTime.  Instead Svete, or his business associates, controlled or directed MUI. If these events occurred as the Receiver alleges, they were doubtlessly critical to the success of the fraudulent conduct at issue.  *See S.E.C. v. Mutual Benefits Corp*., 323 F.Supp.2d 1337, 1342 n.7 (S.D. Fla.,2004) ("noting that primary risk involved in investments in viatical settlements is the misestimation of viators' life expectancies")(citing Carole C. Lamson, *Legal Introduction in Living Benefits in Life Insurance: New Perspectives and Developments,* N.Y. St. B.J., Nov. 1993, at 16, 17 (1993)).

The Receiver's Complaint claims that LifeTime's viaticals were unregistered "securities" in violation of the Federal Securities Act of 1933, 15 U.S.C. §77, and Ohio Rev. Code §1707.44, and that Defendants engaged in other misconduct in violation of these statutes including: (1) Defendants' failure to make appropriate disclosures to the investors; (2) Defendants' materially false statements regarding the insureds' life expectancies and future premium payments to be made by LifeTime; and (3) the unlikelihood that investors would ever be required to make future premium payments.  The Receiver also alleges that Defendants "failed to disclose and to explain to investors the intricacies associated with an investment in viaticals, which made viaticals unsuitable as primary investment instruments for many investors."  (Doc. #1 at 11).  The Receiver lists the attendant risks of viaticals as:

  a.  Risks associated with acts of negligence and/or criminal fraudulent conduct by the parties in whose name the policies were procured and the

by the parties who sold the policies to LifeTime.

b.     Risks of illiquidity in obtaining any return on the viatical settlements.

c.     Risks associated with the possibility that policies would lapse as a result of the exhaustion of reserves required to pay premiums in the event that the insured lived longer than expected, in which event the investors would be required to contribute additional monies to pay premiums in order to prevent the policies from lapsing.

d.     Risks that the insurance company would contest the proceeds of the policy if the viator died during the period of contestability by the company.

e.     Risks that the insurance company might become insolvent.

f.     Risks associated with the lack of market integrity and regulation of viaticals.

(Doc. #1 at 11).

The Receiver also claims that Defendants violated the Federal Securities Act of 1934, 15 U.S.C. §78j(b), by making affirmative misrepresentations and unlawful omissions that were calculated to deceive investors through guarantees of high rates of return on investments with an absence of risk.  According to the Receiver, Defendants failed to perform any meaningful due diligence (1) to ascertain that the investors' money would be placed in viaticals based upon legitimate and independently derived life expectancy analysis; or (2) to ascertain that the investors were matched with insurance policies that were not tainted by fraud in the procurement, which, if so tainted, would have subjected the policies to rescission by the insurance companies.  One way a fraud in the procurement of life insurance could occur is when a terminally ill person obtains a life insurance policy without disclosing the existence of his or her terminal illness.  *See, e.g., Jamieson*, 427 F.3d at 400.

The Complaint further claims that Defendants violated the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 17 U.S.C. §§1962 and 1964(c), as well as Ohio's anti-racketeering statute, Ohio Rev. Code §2923.34, by engaging in a pattern of corrupt activities to their own benefit and to the benefit of a RICO enterprise, namely, LifeTime.  Defendants accomplished this, according to the Receiver, by utilizing LifeTime's resources including its promotional materials and life expectancies manufactured by a LifeTime affiliate, MUI.

Each of the Receiver's remaining claims – fraudulent transfer, breach of fiduciary duty, negligence, unjust enrichment, fraud, breach of contract, and civil conspiracy – are based on the same factual allegations concerning Defendants' knowing or negligent participation in the Ponzi scheme that LifeTime became.

### III. THE PARTIES' CONTENTIONS AND THE ARBITRATION PROVISIONS

The Heartland Defendants seek an Order compelling arbitration of the Receiver's claims against them pursuant to a mandatory arbitration provision in the Lender Agreements and Escrow Agreements.  The Heartland Defendants maintain that the Lender and Escrow Agreements are the basis for the Receiver's claims against them, particularly since these Defendants allegedly used these Agreements to perpetrate the fraud.  The Heartland Defendants assert, "Based on the claims being asserted by Plaintiff and the authority granted to him by the order appointing him as receiver, Plaintiff has asserted claims belonging to LifeTime.  Thus, Plaintiff is bound to the arbitration agreements to the same extent that the receivership entity would have been absent the appointment of the receiver."  (Doc. #154 at 10).

Each Lender Agreement contained the following mandatory arbitration provision:

> All disputes and controversies of every kind and nature between the parties to this agreement including, but not limited to, its existence, construction,

validity, interpretation or meaning, performance, non-performance, enforcement,
operation, breach, continuance, or termination thereof shall be submitted and
settled by arbitration in accordance with the rules of the American Arbitration
Association.  The arbitration shall be held in the city of the party not initiating the
claim before a single arbitrator who is knowledgeable in viatical settlements.  The
arbitrator's decision and award shall be final and binding and may be entered in
any court having jurisdiction thereof.  The arbitrator shall not have the power to
award punitive, exemplary, or consequential damages....

(Doc. #154, Exhibits A1-73).

The Receiver argues that the arbitration provision in the Lender Agreements does not

apply to his claims against the Heartland Defendants, and other Defendants seeking to compel

arbitration, because these Defendants were not parties to the Lender Agreements.  The Receiver

explains that the Lender Agreements set forth the terms and conditions of the transactions

between LifeTime "and the investors unfortunate enough to have purchased LifeTime Capital

viatical products from the Moving Defendants."  (Doc. #239 at 3).  The Receiver further

contends that the Heartland Defendants were parties to very specific Representative Agreements,

which contain the following arbitration provision:

18.  Resolution of Disputes by Settlement and Arbitration

... If LifeTime Capital, Inc. and Representative cannot agree on a written
settlement within sixty (60) days after a dispute arises, or within a longer period
as they should agree upon then the matter in controversy shall be settled by
arbitration, in accordance with the Nevada Arbitration Act, and judgment upon
the award rendered by the arbitrator(s) may be entered in any court of competent
jurisdiction.  The place of any arbitration shall be Nevada.

Except as specifically provided to the contrary in this Agreement the
parties expressly waive the right to litigate in a judicial forum all disputes and
waive the right to trial by jury....  However, notwithstanding the foregoing,
LifeTime Capital, Inc. shall not be required to negotiate, arbitrate or litigate as a
condition precedent to taking any action under this Agreement, including without
limitation, terminating this Agreement or taking any action with respect to this
Agreement.

(Doc. #239, Exhs. 5-11).  The Representative Agreements further provide:

>28.  Governing Laws and Venue:
>
>    The laws of the State of Nevada shall govern this Agreement.
>Representative agrees that LifeTime Capital, Inc. may institute any action or legal
>proceeding against representative arising out of or relating to this agreement in
>any state or federal court of jurisdiction in the U.S.A.  Representative irrevocably
>submits to the jurisdiction of said court and waives any objection he/she/it may
>have to either the jurisdiction or venue of such court.

*Id*.  The Receiver contends that these provisions are permissive not mandatory and that these

provisions apply because the Heartland Defendants, and other Defendants seeking arbitration,

were acting pursuant to the Representative Agreements.

The Receiver concludes, "Clearly, therefore, given that this lawsuit pits the LifeTime

Capital Receiver against the LifeTime Capital representatives for claims relating to their sales of

LifeTime Capital products and the commissions paid them pursuant to their individual

Representative Agreements, the Receiver's right to assert any claims against the Moving

[Heartland] Defendants..., in court rather than in arbitration is clear."  (Doc. #239 at 4).


## IV.    ANALYSIS

### A.    The FAA

Under Federal Arbitration Act (FAA), "[a] written agreement to arbitrate disputes arising

out of a transaction in interstate commerce 'shall be valid, irrevocable, and enforceable, save

upon such grounds as exist at law or in equity for the revocation of any contract.'"  *Javitch v.*

*First Union Securities, Inc*., 315 F.3d 619, 624 (6th Cir. 2003) (quoting in part 9 U.S.C §2).

"Manifesting a 'liberal federal policy favoring arbitration agreements,' the FAA 'is at bottom a

policy guaranteeing the enforcement of private contractual arrangements.'" *Javitch*, 315 F.3d at

624 (quoting in part *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614,

625 (1985)); *see Cooper v. MRM Investment Co*., 367 F.3d 493, 498 (6th Cir. 2004). "If the

parties contract to resolve their disputes in arbitration rather than in the courts, a party may not

renege on that contract absent the most extreme circumstances." *Stout v. J.D. Byrider*, 228 F.3d

709, 715 (6th Cir. 2000). "However, the federal policy in favor of arbitration is not an absolute

one. Arbitration under the Federal Arbitration Act is 'a matter of consent, not coercion.'" *Albert

M. Higley Company v. N/S Corp*., __ F.3d __, __, 2006 WL 985753 *1 (6th Cir. 2006) (quoting in

part *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ*., 489 U.S. 468, 479

(1989)).

### B. <u>The Representative Agreements</u>

The Court's first task when considering a motion to compel arbitration under the FAA is

to determine whether the parties agreed to arbitrate. *Stout*, 228 F.3d at 714. Thus, in the present

case, the initial inquiry is whether LifeTime and the Heartland Defendants, or the other

Defendants seeking to compel arbitration, agreed to arbitrate the disputes raised by the

Complaint. *See Stout*, 228 F.3d at 714. Resolving this inquiry begins with the recognition that

the Receiver "is bound to the arbitration agreements to the same extent that the receivership

entities [here, LifeTime] would have been absent the appointment of the receiver." *Javitch*, 315

F.3d at 627.

The only written agreement to arbitrate between LifeTime and the Heartland Defendants,

or the other Defendants seeking arbitration, appears in paragraph 18 of the Representative

Agreements. *See* Doc. #239, Exh. 5. The Heartland Defendants contend that the arbitration

provision in the Representative Agreements is mandatory, and as a result, the Receiver must

proceed in arbitration.  This is incorrect.  The Representative Agreements, when read as a whole, contain both an arbitration provision and an exception.  The arbitration provision appears in paragraph 18, which states that if the parties cannot agree on a written settlement within a certain time, "then the matter in controversy shall be settled by arbitration...," and that "the parties expressly waive the right to litigate in a judicial forum all disputes and waive the right to trial by jury...." *Id*.  Yet, Paragraph 18 also contains an exception:  "However, notwithstanding the foregoing, LifeTime Capital, Inc. shall not be required to negotiate, arbitrate or litigate as a condition precedent to taking any action under this Agreement, including without limitation, terminating this Agreement or taking any action with respect to this Agreement." *Id*.  In addition, paragraph 28 of the Representative Agreements specifically excepts LifeTime from arbitration by giving LifeTime the right to institute "any action or legal proceeding against representative arising out of or relating to this agreement in any state or federal court of jurisdiction in the U.S.A." *Id*.  at ¶28.  The Heartland Defendants seek to avoid the significance of this specific exception by arguing that the Receiver's construction of it negates the mandatory arbitration language creates an ambiguity.  (Doc. #248 at 6).  This contention lacks merit.

A contract is only ambiguous if it can be reasonably interpreted to support two different positions. *See Mead Corp. v. ABB Power Generation, Inc*., 319 F.3d 790, 798 (6th Cir. 2003); *see also Albert M. Higley Company*, __ F.3d at __, 2006 WL 985753 at *3.  The language in paragraphs 18 and 28 of the Representative Agreements does not require interpretation; it is clear and unambiguous: paragraph 18 contains both an arbitration provision and exception.  The exception simply gives LifeTime the option of proceeding with either arbitration or litigation.  Paragraph 28 confirms the exception by giving LifeTime the right proceed in state or federal

court.  Because the arbitration provision and this exception are not susceptible to more than one interpretation, no ambiguity exists.  *See Albert M. Higley Company*., __ F.3d at __, 2006 WL 985753 at *3 (affirming denial of motion to compel arbitration in part because no ambiguity existed in contract giving one party sole discretion to determine whether dispute was to be resolved through arbitration or litigation).

The Representative Agreement between LifeTime and Erin Richardson contains a mandatory arbitration provision with no exception giving either party the option of litigating its disputes.  *See* Doc. #239, Exh. 12 at ¶10.5.  This mandatory arbitration provision provides in pertinent part:

> All disputes and controversies of every kind between the parties to this Agreement arising out of or in connection with this Agreement..., shall be submitted and settled by arbitration....

*Id*.  The Receiver acknowledges the existence of this arbitration provision and does not argue that it is inapplicable to his claims against Erin Richardson.  *See* Doc. #239 at 3-4. Consequently, and in light of LifeTime's agreement with Erin Richardson to mandatory arbitration, Richardson's Motion to Compel Arbitration is well taken.

Accordingly, with the exception of Erin Richardson, the Representative Agreements do not mandate arbitration of the Receiver's claims against the Heartland Defendants and other Defendants seeking arbitration.

### C.    The Lender and Escrow Agreements

The Heartland Defendants also seek to compel arbitration by way of the mandatory arbitration provision in the Lender and Escrow Agreements.  This is problematic because the Heartland Defendants and the other Defendants were not parties or signatories to these

Agreements. These Agreements imposed no duty upon the Heartland Defendants or other representatives and created no contractual right in their favor. Consequently, under the specific terms of the Lender and Escrow Agreements, the Heartland Defendants and the other Defendants seeking to compel arbitration have no contractual right – and hence no right under the FAA – to seek or obtain enforcement of the mandatory arbitration provision contained in these agreements. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *AT&T Technologies, Inv. v. Communications Workers of America*, 475 U.S. 643, 648 (1986); *cf. Equal Employment Opportunity Commission v. Circuit City Stores, Inc*., 285 F.3d 404, 407 (6th Cir. 2002)(EEOC, a nonparty to an arbitration agreement, not required to arbitrate); *cf. also Denney v. BDO Seidman, LLP*., 412 F.3d 58, 68 (2nd Cir. 2005) ("We may not compel a party to arbitrate a dispute where there is a genuine issue as to whether the non-moving party actually agreed to arbitrate").

To avoid this conclusion, the Heartland Defendants contend that the Receiver "cannot maintain his action without reference to the Lender and Escrow Agreements, and accordingly, this action is covered by the arbitration clauses." (Doc. #154 at 8). This argument lacks merit for two reasons: first, it does not demonstrate that these Defendants are signatories or parties to the Lender or Escrow Agreements; second, the Receiver brings each of his claims against these Defendants without attempting to enforce the terms of the Lender or Escrow Agreements. Although the Receiver's allegations (and possibly his future evidence) certainly references these Agreements, his claims against Defendants are not derived from the terms of these Agreements, which pertain only to the rights and obligations of the investors and LifeTime, not the Heartland Defendants or other representatives.

13

In addition, the Lender and Escrow Agreements were a product – not the sources – of the fraud and other misconduct allegedly committed by Defendants. This is seen in the manner in which the Receiver has framed his Complaint as a dispute between the Receiver and LifeTime's Representatives (like the Heartland Defendants), not a dispute between the parties to the Lender and Escrow Agreements – LifeTime (hence, the Receiver) and the investors. Instead, the Receivership was created, in essence, to align the interests of both the LifeTime Receivership with the investors in order to prevent "waste and disposition of the assets of ... [LifeTime] to the detriment of the investors...." (Doc. #239, Exh. 1 at 1). As such, and in light of the specific claims raised by the Complaint, the present case is more accurately viewed as the Receiver's attempt to protect and enhance the assets of the Receivership by seeking to hold the Heartland Defendants and other brokers or representatives of LifeTime liable for the harm they allegedly caused to the investors and the resulting Receivership. *See* Doc. #1 at 10-20. Such claims and alleged harm are remote, and simply do not derive, from the terms of the Lender and Escrow Agreements. *Cf. Liberte Capital Group, LLC v. Capwill*, 148 Fed.Appx. 413, 417 (6th Cir. 2005) ("Whether WSSI [a viatical representative] is liable for the misconduct of its agents under various theories of recovery – the subject of the arbitration – is not even remotely related to the purposes of the class action.").[4]

The Heartland Defendants also point to the Receiver's breach of contract claim in the Complaint's Eleventh Claim for Relief, which states in part:

109.    The Defendants had contracts with their Investors and with LifeTime to

_____

[4]  The arbitration referred to in *Liberte Capital Group* occurred, not at the behest of representatives or brokers, but when several investors filed claims in arbitration with the National Association of Securities Dealers against the brokers or representatives. 148 Fed. Appx. at 415. Unlike the present case, the representatives in *Liberte* sought to dismiss the arbitration. No such arbitration has occurred in the present case.

engage in the solicitation and sale of LifeTime products in a fair manner.

110.    The Defendants breached their contracts with their Investor clients and
LifeTime.

111.    As a direct and proximate result of the Defendants' breach of contract, the
Investors, LifeTime, and consequently the pooled receivership estate,
were damaged.

(Doc. #1 at 19).  Based on this language, the Heartland Defendants contend, "all the Receiver's

claims for fraudulent conduct and breach of contract are based upon the relationship among

LifeTime, (the interests of the Receiver), the investors (the individuals who invested in viaticals)

and the agents and brokers who marketed them.... [T]he 73 Lender Agreements and Escrow

Agreements are the basis for the lawsuit brought against the Defendant Heartland Viatical and its

agents.  These Lender Agreements and Escrow Agreements are the financial instruments used ...

to allegedly perpetrate the fraud.  Each of these Lender and Escrow Agreements contains an

arbitration agreement...."  (Doc. #248 at 2-3).  This reasoning, however, does not show that the

breach of contract claims raised in paragraphs 109-111 of the Complaint require enforcement of

the arbitration provision in the Lender and Escrow Agreements.

Paragraphs 109 through 111 of the Complaint refer in part to contracts between

Defendants and the investors.  Yet, these paragraphs do not specifically mention the Lender or

Escrow Agreements or specifically claim a breach of these Agreements.  Indeed, paragraphs

109-111 cannot be reasonably construed to include a claim that Defendants breached the Lender

and Escrow Agreements for the simple reason that Defendants were not signatories or parties to

these Agreements.  These agreements – including their mandatory arbitration provisions –

created no rights in Defendants' favor and imposed no obligation on Defendants .  Consequently,

the Receiver's breach of contract claims cannot derive from the terms of the Lender or Escrow

Agreements.

In addition, the vast majority of the Receiver's claims need no contractual source because his claims are based on allegations related to the Ponzi scheme that LifeTime became.  The Complaint mainly alleges that this Ponzi scheme occurred in part due to Defendants' fraudulent conduct.  As a result, these claims against Defendants are fraud – not contract – driven.  Although the Complaint describes relationships among LifeTime, the Defendants, and the investors, the existence of these relationships arose in part from Defendants' acts of fraud rather than from any agreement by Defendants to the terms contained in the Lender or Escrow Agreements, including the arbitration provisions.  Thus, the relationships among LifeTime, the Representatives, and the investors does not trigger the arbitration provisions in the Lender and Escrow Agreements.

Accordingly, for all the above reasons – with the exception of Defendant Erin Richardson – the Heartland Defendants' Motion to Compel Arbitration, joined by Defendants James S. Stanley, AB to Z Financial Services, Gayle Jendzejeck, and Erin Richardson, and Defendant Lewis McBride's Motion to Compel Arbitration lacks merit.

### IT IS THEREFORE RECOMMENDED THAT:

1. Motion to Compel Arbitration filed by Heartland Viatical, Inc., Erika Blackburn, Thomas Parker, Kenneth W. Johnson, Brent Worley, and Robert Boone (Doc. #154) and joined by Defendants James S. Stanley, AB to Z Financial Services, Gayle Jendzejec (Doc. #203) be DENIED;

2. Erin Richardson's Motion to Compel Arbitration (Doc. #s 154, 203) be GRANTED; the Receiver's claims against Erin Richardson should be DISMISSED; and the Receiver should be directed to arbitrate his claims, if any, against Erin Richardson pursuant to the terms of her Representative Agreement (Doc. #239, Exh. 12); and

3.      Defendant Lewis McBride's Motion to Compel Arbitration (Doc. #237) be
        DENIED.


June 2, 2006


                                        s/ Sharon L. Ovington
                                        Sharon L. Ovington
                                        United States Magistrate Judge


17

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).

18